Filed 7/25/16  P. v. Vivano CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>OCTAVIO VIVANO,<br><br>    Defendant and Appellant. | A141737<br><br>(Alameda County<br>Super. Ct. No. C168026) |

Appellant Octavio Vivano was convicted of participating in a 2000 gang rape after his DNA profile was entered into a forensic database in 2009 and found to match DNA evidence taken from the rape victim.  On appeal, he maintains that his conviction must be reversed because of trial errors made by the judge, the prosecutor, and his defense counsel.  He argues that the trial judge wrongly 1) allowed the trial to proceed after a testifying officer made intemperate remarks outside of the court in the presence of some jurors, 2) admitted statements the victim made to a hospital nurse after the rape; and 3) barred the defense from cross-examining the victim about an unrelated sexual assault in another state.  And he argues that 1) the prosecutor improperly shifted the burden of proof in closing arguments and 2) defense counsel provided ineffective assistance.  Some of these arguments were forfeited, but we reject all of them in any event.  The judgment is therefore affirmed.

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

On the evening of July 14, 2000, a 19-year-old woman who was visiting Oakland went out with an African-American man she met on a "party line" that people could call to meet others. Their date ended when the man, while driving in an area of Oakland known for prostitution, suggested she should get out of the car and "make him some money." The victim was offended, argued with the man, got out of the car, walked away, and planned to call a friend on a pay phone.

Before the victim could find a phone, a Hispanic man she did not know drove up from behind her and asked if she wanted a ride. She declined the offer and kept walking. Someone then came from behind her, hit her in the face, dragged her into a car, and beat her as they drove away, with part of her legs still hanging outside the car door. A total of four men, all Hispanic, were in the car, and Vivano was driving. They took the victim to a nonresidential area on Tunnel Road near Hiller Highlands in Oakland, ripped off her pants, and took turns raping her. They then pushed her out of the car and drove away. The victim ran down the mountain and flagged a passing car, and the motorist called police.

The victim was taken to the hospital, where swabs were taken from her vagina and other parts of her body during a sexual-assault response team (SART) examination. Nine years later, in 2009, Vivano was convicted of different crimes and his DNA profile was entered into a forensic DNA databank, the Combined DNA Index System. DNA testing revealed that Vivano's DNA matched the DNA of sperm found on the victim, and the statistical frequency of such a match was approximately one in one quadrillion. Vivano was eventually arrested in 2010 in Arizona.

Police contacted the victim and asked her to look at a photographic lineup that included Vivano, but she could not identify him and instead said that two other people in the lineup could be possible suspects. But during the preliminary hearing and again at

2

trial, she identified Vivano as the driver of the car and testified that she remembered his distinctive facial acne scars.

A jury convicted Vivano of four counts of forcible rape while acting in concert (Pen. Code, §§ 264.1, subd. (a), 261, subd. (a)(2))[1] and found true allegations that he kidnapped the victim in the commission of the rape (§§ 667.61, subd. (e)(1), 667.8, subd. (a)). Vivano also was convicted of one count of kidnapping to commit another crime (§ 209, subd. (b)(1)) and one count of assault by means likely to produce great bodily injury (former § 245, subd. (a)(1)). The trial court sentenced Vivano to a term of 52 years to life.

II.
DISCUSSION

A. *Vivano's Argument Regarding a Testifying Police Officer's Out-of-court Statement Made in the Jurors' Presence Was Forfeited and Lacks Merit.*

1. Background.

An Oakland police officer briefly testified at trial about his efforts to contact the victim and arrange for her to review a photographic lineup after Vivano was identified as a suspect. The officer was the last witness to testify before jurors were excused for their daily lunch break. During the break, he boarded an elevator with several jurors, who were all wearing their juror badges, and juror No. 4 overheard the officer speaking with someone who appeared to be affiliated with the court. The court affiliate asked the officer why the officer was at the courthouse, and the officer explained he was there to testify. Juror No. 4 then overheard the officer say, "I just hope they send him to prison," at which point the juror told the officer, "You shouldn't be talking like that in front of us." The officer did not say anything else after Juror No. 4 addressed him.

Juror No. 4 reported the exchange to the courtroom bailiff, and the trial judge spoke to the juror about the incident outside the presence of the other jurors. The judge asked Juror No. 4 if the officer's comment affected the juror's view of the trial, and she

---

[1] All statutory references are to the Penal Code unless otherwise specified.

3

responded, "Not at all." When asked if the exchange affected the juror's view of the police officer, Juror No. 4 responded, "I thought it was a poor reflection on him as a police officer, but other than that, it wouldn't affect how I would feel about his testimony, just him as an individual." And when asked if there was "any chance" that the officer's comment might affect how juror No. 4 viewed Vivano, she responded, "Not at all. No [e]ffect whatsoever." Neither the prosecutor nor Vivano's attorney suggested any further questions for the juror.

The trial judge then spoke with other jurors identified as having been in the elevator at the time of the officer's comment. Juror No. 8 overheard the officer make a remark, but he recalled the officer saying "something like, 'Well, I wanted to keep my testimony short,' you know, 'it just means he'll go to prison sooner.'" According to juror No. 8, the officer "quieted down" after he was told that other jurors were in the elevator. When asked by the trial court whether the officer's remark would affect juror No. 8's view of the case, juror No. 8 responded, "No" and stated that "it won't influence me in any way." The juror "took it as, you know, him [the officer] stating kind of— letting some emotion about what he had just gone through, but nothing beyond that." Juror No. 8 also said he would be able to disregard the officer's comment and not let it affect his view of the evidence in the case. The trial judge spoke privately with Vivano's attorney after the attorney said he had a proposed question for juror No. 8, and the judge thereafter asked the juror whether he had a sense of who the person who spoke with the officer was. The juror responded that the person "was dressed in a suit. I don't know if he was, you know, another attorney, if he was a plain clothes police officer, I don't know."

The trial judge next spoke with juror No. 12, who had heard the officer say something to the effect that "[t]he faster that someone's testimony go[es], the faster we'll put the guy away." Juror No. 12 "completely forgot" about the comment and did not think about it until she was asked about it. When asked whether the remark would affect the way she would look at the case, juror No. 12 responded, "No, I think it's—that was his [the officer's] opinion."

4

The next juror to be questioned was No. 15, who told the judge he had heard the officer tell someone that "[his testimony] was fast, quick, and just the way it should be to get him off quicker, something to that effect. He gave his opinion, I guess." Juror No. 15 said he did not think the police officer was referring to Vivano's trial in particular, but instead was speaking generally about "quick testimony to get it over with and put criminals behind bars faster, I guess, that was his comment." He also said that he did not believe the officer's comment would influence his decision in the case.

The trial judge next spoke with juror No. 14, but she reported she had not overheard anything on the elevator, and she was not paying attention when other jurors might have been discussing what the officer said.

The trial judge also spoke with juror No. 6, who reported he heard the officer mention "that he gave us [the jury] testimony as quickly as possible so that the defendant could be convicted." Juror No. 6 said he heard the remark "as talk and not as—I don't consider it as evidence," and he confirmed that he would be able to ignore the comment when weighing the evidence.

After the trial judge had spoken separately with the foregoing six jurors in the presence of Vivano and the attorneys involved, he told the attorneys that he did not intend to separately question any other jurors, and that he planned to next address the issue with the jury as a whole. He planned to ask all jurors whether there was anyone who might have overheard the officer that he (the judge) had missed, and then ask that person if anything heard would affect the person's view of the case. The judge stated, "I just want to cover it that way as a group. I think, given what we've heard so far, I think we reached a point where I think that should suffice." The judge then stated he wanted input from Vivano's attorney, who stated: "At this point, that sounds like an okay procedure to me. However, I would ask the Court at the end of the Court's inquiry and admonishment of the jurors that I get to reserve a possible motion. I don't know if I'm going to bring one, but I just want some time to think about it, I guess, what was said and do some research—" The trial judge responded, "I appreciate the fact that you may have some

5

issues with what's happened that you may want to raise at a later time, and I'm not asking you to waive those," and defense counsel said that was "fine."

When the jurors were reassembled as a group, the trial judge asked whether there was anyone who had heard the police officer say something as they were leaving for the lunch break who had not yet spoken with the judge, and three people (juror Nos. 1, 3, and 10) raised their hands. The judge then asked if there was anyone who felt that what the person heard may affect that person in any way, and the jurors confirmed that the officer's comment would not affect the outcome of the case. The judge then reiterated his instruction that in deciding the facts of the case, jurors must not consider anything they saw or heard outside the courtroom, and he told jurors that whatever the police officer said "should be ignored. It should be disregarded when you're making a decision about the facts of this case, including any opinion you may have heard him express, and it shouldn't be the subject of any further discussion." Defense counsel did not file any motions in connection with the police officer's comment or otherwise object to the trial court's handling of the exchange.

      2.  Vivano forfeited his argument regarding the officer's comment and has failed to establish prejudice.

Vivano contends for the first time in his opening brief on appeal that the officer's comment on the elevator undermined the reliability of the verdict. The argument was forfeited because it was not raised below. (*People v. Foster* (2010) 50 Cal.4th 1301, 1341.)

Furthermore, even if the claim had been properly preserved, we would reject it because, even though the officer's comment was clearly inappropriate, Vivano cannot show prejudice. " 'In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1309, quoting *Remmer v. United States* (1954) 347 U.S. 227, 229.)

6

"The presumption of prejudice ' "may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm." ' " (*Lewis*, at p. 1309.) "A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice." (*In re Hamilton* (1999) 20 Cal.4th 273, 294-295.) Whether prejudice arose from juror misconduct is a mixed question of law and fact subject to our independent determination. (*Lewis*, at p. 1309.)

Here, we cannot conclude that there is any likelihood, much less a substantial one, that Vivano suffered harm because of the officer's inappropriate comment. The jurors who heard the remark understood it was not evidence and confirmed it would not influence their evaluation of the case. If anything, the remark reflected *unfavorably* on the officer in at least one juror's mind, which may be why Vivano's trial attorney raised no objection.

Vivano's reliance on *Parker v. Gladden* (1966) 385 U.S. 363 is misplaced. In *Parker*, the court bailiff assigned to "shepherd" a sequestered jury for more than a week told one juror in the presence of others that the defendant was a "wicked fellow . . . he is guilty," and at another point said, "If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it." (*Id.* at pp. 363-364.) Unlike in this case, one juror in *Parker* stated she *was* prejudiced by the remark. (*Id.* at p. 364.) And the bailiff in *Parker* was an officer of the court who should remain neutral on the question of a defendant's guilt, whereas the officer here was hardly neutral as he was in the special victims unit, assigned to this case when Vivano was first identified as a suspect, and played a role in having him arrested. We are not persuaded by Vivano's argument that the officer's statements "had a substantial and injurious effect on the verdict" warranting reversal.

*B. The Admission of Testimony About How the Victim Described Her Attackers to a Nurse Neither Violated the Confrontation Clause Nor Prejudiced Vivano.*

1. Background.

The nurse who examined the victim after her attack in 2000 no longer worked at the hospital at the time of trial in 2014. Before trial, the prosecutor moved in limine to allow the physician's assistant who supervised and trained the examining nurse to testify at trial about the results of the SART examination. Vivano opposed the request, arguing that admission of the contents of the SART examination would violate the confrontation clause.

During the trial court's discussion of the in limine motion with trial counsel, it became clear that the prosecutor sought the admission of pictures and diagrams attached to the SART report to demonstrate that the victim suffered injuries consistent with being raped by multiple people. The trial court ruled that the documents were admissible "to the extent that they are a record of the objective observations made by this nurse and actions taken, for example, taking photographs, taking swabs, putting the swabs into an envelope and labeling them, things like that, by the examining nurse." (E.g., *People v. Huynh* (2012) 212 Cal.App.4th 285, 320-321 [no violation of confrontation clause to admit testimony about photographs contained in SART report].) The court cautioned, however, that it would not be appropriate to admit over a hearsay objection evidence of what the victim said to the examining nurse, and it stated that "[w]e'll deal with that [potential hearsay objections] at trial."

The lead director of the sexual-assault and domestic-violence program at the hospital where the victim was examined testified at trial that the SART examination of the victim revealed injuries consistent with the victim's trial testimony about the attack. After the attorneys for both sides had finished questioning the witness, the trial court invited questions from jurors. After the court conferred with counsel about some of the questions, the court asked the witness whether there was "any record of the young lady telling the examiner how many people assaulted her." The following exchange then took place, without objection:

8

"THE WITNESS:  Yes.

"THE COURT:  And what was reported to the examiner by [the victim]?

"THE WITNESS:  Okay.  So, there's a specific question, number three, name, number, and race of the assailants, so . . .

"THE COURT:  First of all, the number.  Did she report a number?

"THE WITNESS:  She lists four individuals.

"THE COURT:  All right.  Did she say anything about the race or races of those individuals?

"THE WITNESS:  She describes that they're all Hispanic.  So, she gives a name and approximate age and ethnicity of each."

The foregoing testimony was consistent with the victim's testimony that she was raped by four men and that "[t]hey were all Hispanic."

2.  Analysis.

For the first time on appeal, Vivano argues that the admission of the victim's statement in the SART report identifying her attackers' race violated the confrontation clause because the statement was testimonial.  We begin by doubting that  Vivano preserved this argument for appellate review since he never obtained an express ruling on the objection from the trial court.  (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [where party files motion in limine but does not secure express ruling from court, argument is forfeited].)

But we conclude that the argument lacks merit even if it was properly preserved.  This is because the confrontation clause was not implicated even assuming, without deciding, that the victim's statements to the nurse were testimonial.  "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [her] prior testimonial statements."  (*Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9; see also *People v. Cage* (2007) 40 Cal.4th 965, 978 & fn. 7.)  The victim herself testified on direct examination that all four men who raped her were Hispanic.

9

Furthermore, the admission of the victim's statements to the nurse about her attacker's race was not prejudicial under any standard. Vivano makes much of the fact that during deliberations the jurors asked to hear the victim's testimony of descriptions of the driver of the car she gave "to police and medical personnel," and jurors were "interested especially in distinguishing facial and/or skin characteristics." The court reporter read back a brief excerpt from the hospital employee who testified about the victim's SART examination, which Vivano interprets to mean that the nurse's comments about the attackers' race played a significant role in Vivano's conviction. The trial court also told jurors that their question could be interpreted as seeking testimony from the victim herself, and that testimony also was read to jurors after they confirmed they wanted to hear it. Vivano speculates that "[s]ince appellant was Hispanic, [the victim's] identification of her attacker as Hispanic significantly increased appellant's probability of being convicted." Although it is no doubt true that race generally plays a significant role in eyewitness identification, we find it likely here that jurors' focus on "facial and/or skin characteristics" was a reference to facial acne scars, as opposed to race, because the victim testified she remembered Vivano as having "a polka dot face" with "little holes" all over it. The fact that the nurse briefly testified about the race of the victim's attackers in a way that was consistent with the victim's own testimony does not undermine our confidence in the verdict.

### C. The Prosecutor Did Not Improperly Attempt to Shift the Burden of Proof During Closing Argument.

#### 1. Background.

After the People rested, the parties stipulated that the victim had given certain inconsistent testimony during the preliminary hearing, and Vivano declined to present any witnesses or other evidence. During his closing argument, Vivano downplayed any conclusions to be drawn from the DNA evidence showing Vivano's sperm was found in the victim's vagina and said the jury should instead focus on the lack of other forensic evidence. The attorney noted that the victim had testified she was raped by each of her four assailants for as long as 10 minutes each, yet "the only epithelial cells or other skin

10

cells belonging only to the victim, belonging only to [the victim] were found that's a non sperm DNA. You figure if there were four men assaulting her that you find some skin cell, some non sperm cell from one of the men, but there's no evidence of that. All the non sperm cells all belong to [the victim]. Nothing else. No skin cells, no white blood cells. Actually, she said she didn't even look at white blood cells. But it's hard to believe that skin cells from four different men would not appear on the non sperm DNA of that test."

In his rebuttal argument, the prosecutor addressed the foregoing defense argument as follows: "The other part of the DNA evidence is the defense said, why aren't there any more cells? Why isn't there any DNA present? Why is the only thing [the criminalist who conducted DNA tests] found was sperm DNA? Why is that? I have subpoena power, the defense has subpoena power. If there was an expert out there or someone to come in and say that [the criminalist's] DNA was wrong, had errors, didn't find the things that should have been there, you bet your boots that person would have been here in court, and they're not. The defense failed to call logical witnesses to discuss how anything wrong with [the criminalist] should cast doubt—" Vivano's attorney then objected based on "[b]urden shifting," but the objection was overruled. The prosecutor continued: "Cast doubt in this case. [¶] The defense even said, how do we know the driver ejaculated? Because we have his sperm."

2. Analysis.

Vivano briefly argues that the foregoing portion of the prosecutor's rebuttal argument improperly implied that it was his burden to prove his innocence in violation of the due process clause, but we are not persuaded. A defendant's challenge to rebuttal argument must be evaluated in light of the defense argument to which it replied. (*People v. Chatman* (2006) 38 Cal.4th 344, 386.) Here, the prosecutor was responding to defense counsel's suggestion that the supposed lack of DNA evidence other than Vivano's sperm somehow called into question the victim's allegations of forcible rape. It was entirely appropriate in these circumstances for the prosecutor to note that Vivano failed to provide any evidence that the lack of skin cells had any significance. "A

11

distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) "[A] prosecutor is permitted to comment on the state of the evidence and the defendant's failure to call a logical witness," so long as the prosecutor does not refer directly or indirectly to a defendant's failure to testify, which did not occur here. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 387 & fn. 12.) The prosecutor did not commit error.

### D. The Trial Court Correctly Excluded Evidence of the Victim's Report of Sexual Assault Unrelated to Vivano's Attack.

#### 1. Background

During their investigation, Oakland police learned that the victim had been the victim of a sexual assault in Las Vegas about a year after her attack in Oakland. The prosecutor and Vivano's attorney apparently received an incident report from the Las Vegas police department summarizing the investigation of the 2001 incident,[2] but the report offers little detail. The incident report is dated December 13, 2001, but it describes an event that took place months earlier. It states that around 11 p.m. on August 18, 2001, the victim was attacked as she was walking from her car to her apartment complex. The attacker hit her, apparently rendering her unconscious, and she woke up around 12:30 a.m. in a ditch with her shirt off and her shorts ripped. The victim called 911 on her cell phone, and the police who responded called for an ambulance to take her to the hospital, where examiners took pictures of the cuts and bruises on her face, arms, and buttocks. The incident report also states: "[The victim] said that a metro police officer took a police report. At this time we have been unable to find that report, and it was suggested that she file a report for that date." (Unnecessary capitalization omitted.) It is

---

[2] The incident report was not included in the record on appeal. On November 26, 2014, Vivano filed a motion to augment the record with the incident report, and respondent opposed the motion. We grant the motion to augment.

unclear whether such a report was ever filed (either at the time of the attack or after the incident report was prepared) or why the incident report was prepared in December.

The prosecutor moved in limine to bar admission of evidence of the victim's sexual conduct (Evid. Code, § 1103, subd. (c)(1)), including the 2001 sexual assault in Las Vegas. At the hearing on the motion, Vivano's attorney said he had seen the report relating to the assault but did not have it with him, meaning his arguments were based on his recollection of the report and not on the actual document. Defense counsel stated he recalled that the victim had reported the attack a few months after it purportedly occurred, and he wanted the option to cross-examine the victim about whether the 2001 event was a "false reporting." Such a false reporting was not in fact clearly established by the police document, which noted that police had responded to the scene when the victim called for them and that pictures of her injuries were taken when she was taken to the hospital—not months later, as defense counsel mistakenly recalled at the hearing. Defense counsel did acknowledge that he had no evidence that it was a false report. And he all but conceded that it would be a risky strategy to question the victim about her truthfulness, given that she most likely would testify that she was, in fact, assaulted in 2001 as she had reported.

The trial court ruled that in the absence of any evidence that the victim made a false report, the 2001 assault was not relevant to the victim's credibility and thus was inadmissible. The ruling was without prejudice to Vivano raising the issue again "if something happens during the trial that changes everything and makes it relevant and appropriate for inquiry." No further information was ever provided.

> 2. The trial court did not abuse its discretion by barring cross-examination regarding the 2001 sexual assault.

Vivano's first argument, which we reject, is that the trial court abused its discretion by prohibiting cross-examination regarding the victim's 2001 report of sexual assault. The prior assault report would have been admissible for impeachment purposes only if it was false (*People v. Alvarez* (1996) 14 Cal.4th 155, 201), and Vivano offers only speculation on appeal that the report was, in fact, false. True, the trial court and the

13

attorneys apparently did not have a copy of the incident report in front of them when they discussed it at a hearing and mistakenly recalled that the victim did not timely report the sexual assault, but the statement in the incident report that the victim in fact *did* timely report the assault actually weighs in favor of the victim's veracity. Vivano also notes that the trial court referred to the victim as having been drugged, whereas the report makes no mention of these facts. The report says that the victim ran into a wall as her attacker chased her around 11 p.m., and "the next thing she knew she was hit with a hand or something," and then she woke up in a ditch around 12:30 a.m., leaving open the possibility the victim *was* drugged. (Unnecessary capitalization omitted.)

But whether the victim was unconscious for more than an hour because she was drugged or because of the physical impact of being hit does not undermine the trial court's conclusion that the incident was inadmissible absent some evidence indicating that the report was false. We also reject Vivano's speculation that the absence of a police report indicates that a police report was not made at the time of the attack, because it is unclear what role the subsequent incident report played in any investigation. In short, we disagree with Vivano that there was substantial evidence the Las Vegas report was false. The trial court did not abuse its discretion in barring its admission. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1458 [where no conclusive evidence that victim's prior rape complaints were false, no abuse of discretion to bar their admission].)

> 3. The trial court's ruling did not violate Vivano's rights under the confrontation clause.

We also reject Vivano's argument that prohibiting cross-examination on the 2001 report of sexual assault violated his rights under the confrontation clause. To begin with, this objection was forfeited because it was not raised below. (*People v. Thornton* (2007) 41 Cal.4th 391, 427.)

In any event, the argument lacks merit. "Although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination.' " (*People v.*

*Quartermain* (1997) 16 Cal.4th 600, 623, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*Quartermain*, at pp. 623-624.) The victim's credibility regarding her attack in Oakland was never seriously questioned, and examining her about the Las Vegas attack would have added little, if anything, to the jury's evaluation of her truthfulness. (*People v. Bautista* (2008) 163 Cal.App.4th 762, 783 [no error under confrontation clause to exclude testimony about victim's sexual conduct where examination on topic "would not have had a significant impact on defendant's defense or on the jury's impression of (the victim's) credibility"].)

### 4. Vivano did not receive ineffective assistance of counsel.

Finally, we disagree with Vivano that he received ineffective assistance of counsel because his trial attorney supposedly misunderstood the Las Vegas incident report and thus did not draw the court's attention to the fact that there apparently was no police report filed in connection with the incident and the victim was not actually drugged as the trial court mistakenly believed. Again, the circumstances contained in the 2001 incident report are unclear even with a careful review of the report, and evidence surrounding the events it described were properly excluded in any event. Vivano suffered no prejudice.

### III.
### DISPOSITION

Vivano's November 26, 2014 motion to augment the record on appeal is granted. The judgment is affirmed.

                                                _____

Humes, P.J.

We concur:


_____

Dondero, J.


_____

Banke, J.